**AFFIDAVIT IN SUPPORT OF**
<u>AN APPLICATION FOR SEARCH WARRANTS</u>

I, Christina Pasquarello, being duly sworn, depose and state as follows:

<u>Introduction And Agent Background</u>

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Task Force Officer ("TFO") assigned to the Drug Enforcement Administration ("DEA") New England Field Division, Task Force 5, a role I have held since June 2023. As a Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code.

2. I am also a police officer with the Cambridge Police Department presently serving as a Detective. I have been a Police Officer in the City of Cambridge, Massachusetts since November 2017. As a Cambridge police officer, I have received training and specialized instruction from the Massachusetts Police Training Committee (MPTC). In 2016 I received a Bachelor of Science degree in business Administration from Northeastern University. In 2021 I received my Master of Arts in Criminal Justice from Curry College.

3. As a TFO, and as a police officer, I have participated in physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

1

4. I am familiar with the methods used in narcotics trafficking and money laundering, to include online drug trafficking. I communicate constantly with other agents and law enforcement officers to learn new information about the current trends and activities associated with narcotics trafficking.

Previous Warrants

5. On August 15, 2023, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective location information associated with the cellular telephone assigned call number (760) 548-7698 (Target Telephone 1). See 23-MJ-8255.

6. On February 16, 2024, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with the cellular telephone assigned call number (310) 261-9926 (Target Telephone 2). See 24-MJ-8114.

7. On March 15, 2024, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, issued a search warrant authorizing the use of a cell-site simulator to obtain dialing, routing, addressing, or signaling information from Target Telephone 2. See 24-MJ-1513.

8. On March 18, 2024, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with the cellular telephone assigned call number (310) 261-9926 (Target Telephone 2). See 24-MJ-8154.

9. On November 19, 2024, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and

prospective precise location information associated with the cellular telephone assigned call number (323) 319-5936. See 24-MJ-8613. No information was seized pursuant to Search Warrant 24-MJ-8613.

10. On November 20, 2024, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with the cellular telephone assigned call number (310) 261-9926. See 24-MJ-8614.

11. On December 20, 2024, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with the cellular telephone assigned call number (213) 849-0202 (Target Telephone 3). See 24-MJ-8632. Investigators continued to receive pings from Target Telephone 3 up until the warrant (24-MJ-8632) expired on January 20, 2025.

12. On January 21, 2025, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with Target Telephone 3. See 25-MJ-8019. On the morning of January 22, 2025, I learned that the International Mobile Subscriber Identity (IMSI) [1] associated with Target Telephone 3 had changed from 310240353370384 to 310260323658728. However, records obtained from T-Mobile stated that Target Telephone 3 remained active. As such, based on my training and experience, I understood that the user of Target Telephone 3 changed the SIM card for the telephone.

13. On January 22, 2025, the Honorable Rozella A. Oliver, United States Magistrate

---

[1] I know from my training and experience that the IMSI is a unique 14-15 digit number assigned to each mobile subscriber. It is stored on the Subscriber Identity Module (SIM) card and uniquely identifies the subscriber within a network.

3

Judge, Central District of California, issued a search warrant authorizing the use of a cell-site simulator to obtain dialing, routing, addressing, or signaling information from Target Telephone 3 using the new IMSI number described above (310260323658728). See 25-MJ-00238.

14.   On January 24, 2025, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing the seizure of historical and prospective precise location information associated with Target Telephone 3. See 25-MJ-8053.

15.   On February 3, 2025, the Honorable Paul G. Levenson, United States Magistrate Judge, District of Massachusetts, issued a criminal complaint charging Ricardo Alfredo Lievano (LIEVANO) and a codefendant with conspiracy to distribute controlled substances in violation of . 21 U.S.C. § 846. See 25-MJ-8097.[2]

16.   On February 10, 2025 the Honorable Maria A. Audero, United States Magistrate Judge, Central District of California, issued a number of search warrants including (a) a warrant authorizing the search of a residence located at 6298 W. 3rd Street, Unit # 225, Los Angeles 925-MJ-005980, and (b) a warrant authorizing the search of the person of LIEVANO. See 25-mj-00600 (collectively, the February 10th Search Warrants").

## Purpose of the Affidavit

17.   On February 11, 2025, DEA agents seized seven cellular telephones (the "Seized Devices") described further in Attachment A incorporated herein pursuant to the February 10th Search Warrants. On February 13, 2025, the Seized Devices were received into the custody of the DEA in Boston. Accordingly, pursuant to the venue provisions of Rule 41(b) of the Federal Rule of Criminal Procedure, I submit this affidavit in support of an application for the issuance of seven search warrants authorizing the search of the Seized Devices. The Seized Devices, each of which

---

[2] Arrest warrants were also issued.

4

remain in the custody of the DEA in Boston include:

> a. An iPhone with white face (labeled N-63) (Seized Device #1). Seized Device #1 is further described in Attachment A.
>
> b. An iPhone with a white back (labeled N-64) (Seized Device #2). Seized Device #2 is further described in Attachment A.
>
> c. An iPhone that is black with a clear case (labeled N-65); (Seized Device #3). Seized Device #3 is further described in Attachment A.
>
> d. An iPhone with a dark clear case (labeled N-66); (Seized Device #4). Seized Device #4 is further described in Attachment A.
>
> e. An iPhone that is black with no case (labeled N-67); (Seized Device #5). Seized Device #5 is further described in Attachment A.
>
> f. An iPhone that is black with a clear ribbed case (labeled N-68); (Seized Device #6). Seized Device #6 is further described in Attachment A.
>
> g. An iPhone with gold sides and a clear case (labeled N-69); (Seized Device #7). Seized Device #7 is further described in Attachment A.

18. As further described below, I believe there is probable cause to believe that: LIEVANO, and others known and unknown, have committed violations of 21 U.S.C. § 841 (distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute controlled substances), and 21 U.S.C.§ 843(b) (use of a communication facility in the commission of controlled substances trafficking offenses).

19. I also believe there is probable cause to believe that LIEVANO used one or more of the Seized Devices described further in Attachment A in furtherance of the Target Offenses; and that such Seized Devices will contain evidence, fruits, and instrumentalities of the Target Offenses as described further in Attachment B incorporated herein.

20. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, police officers, and other witnesses. This affidavit is intended to show merely that there is sufficient probable

5

cause for the requested warrants and does not set forth all of my knowledge about this matter.

Probable Cause

*The Boston Investigation*

21. In 2022, a Confidential Source ("CS-1"), began cooperating with agents assigned to DEA following his/her arrest on federal drug trafficking charges.[3] During the course of being debriefed, CS-1 acknowledged that he/she had previously distributed cocaine (and fentanyl) before being arrested by the DEA. CS-1 stated that he/she (CS-1) obtained quantities of cocaine from several sources of supply, including LIEVANO. CS-1 explained that he/she had not done business with LIEVANO in a while, but that he/she (CS-1) would reach out to LIEVANO and attempt to order cocaine.

22. In July 2023, acting at the direction of agents, CS-1 contacted LIEVANO via a mutual acquaintance. On July 27, 2023, CS-1 received an unsolicited call from LIEVANO via a FaceTime account linked to the cellular telephone assigned call number (760) 548-7698 ("Target Telephone 1"). The call was not recorded. CS-1 informed investigators that during the call LIEVANO stated that he (LIEVANO) was willing to send cocaine and/or fentanyl to CS-1 from California to Massachusetts. LIEVANO stated that the cocaine would be shipped from California by truck. LIEVANO told CS-1 that his truck driver would deliver some of the cocaine to Maryland, but that the remainder of the cocaine would be delivered to CS-1 in Massachusetts.

---

[3] On May 8, 2023 CS-1 pleaded guilty to an Information alleging that CS-1 conspired with others to distribute five kilograms or more of cocaine. CS-1 also pleaded guilty to possession of a firearm while under indictment. CS-1 is cooperating in the hopes of receiving a favorable sentence related to the plea. CS-1 has a criminal history that includes arrests for felonies involving illicit drugs. Further, during a surrender hearing in early 2025, CS-1 admitted violating several conditions of pre-trial release. As described further herein, information provided by CS-1 in this investigation has led to the seizure of narcotics and the identification of drug traffickers and has been corroborated to the extent possible. I believe information provided by CS-1 to be reliable.

LIEVANO told CS-1 that he (LIEVANO) expected the shipment to occur in approximately one month.

23. After CS-1 informed agents of the July 27, 2023 call with LIEVANO, investigators instructed CS-1 to place a recorded call to LIEVANO in order to plan a controlled delivery. On August 7, 2023, CS-1 placed a recorded FaceTime call to LIEVANO at Target Telephone 1. After exchanging greetings with CS-1, LIEVANO stated, "We almost ready." In response, CS-1 told LIEVANO that he/she (CS-1) did not currently have the money to pay the driver. LIEVANO then stated, "We need to pay him over there." I know from my training and experience and from conversation with CS-1, that by "We need to pay him over there," LIEVANO meant that he (LIEVANO) needed to pay his supplier in Mexico.

24. Before the conversation concluded, LIEVANO told CS-1 that CS-1 could send payment to LIEVANO in the mail. LIEVANO stated, "I gonna receive 60 pieces, 20 for you, 40 for Maryland." LIEVANO told CS-1, "Okay, … let me talk with you tomorrow, … and I will let you know … because I'm f---in' ready, my driver and everything." Thereafter, the call ended. Based on the investigation, I believe LIEVANO was planning to send 60 kilograms of cocaine via a truck driver, and that 40 kilograms would be delivered to a customer in Maryland and 20 kilograms would be delivered to CS-1.

25. Following the August 7, 2023 call, LIEVANO and CS-1 did not complete the anticipated deal for cocaine. CS-1 attempted to contact LIEVANO via Target Telephone 1 on several occasions, however, LIEVANO did not respond.

26. On January 24, 2024, CS-1 informed investigators that he/she (CS-1) had received an unsolicited FaceTime call from LIEVANO. CS-1 told investigators that during the call, which was not recorded, LIEVANO told CS-1 that he (LIEVANO) had not been in touch with CS-1

because he (LIEVANO) lost the phone he had previously dedicated to CS-1. LIEVANO explained that he (LIEVANO) dedicates a single telephone to each customer.

27. At the direction of agents, between January 26, 2024 and February 7, 2024, CS-1 communicated with LIEVANO via Target Telephone 2 using FaceTime calls and text messages in order to arrange the proposed meeting with LIEVANO in Los Angeles to negotiate future drug shipments to Boston.[4]

28. On February 7, 2024, CS-1 flew from Boston to Los Angeles International Airport (LAX). After arriving in Los Angeles at approximately 5:10 p.m.,[5] CS-1- was met by DEA investigators, and taken to a nearby meeting location, where he/she (CS-1) was provided with an audio transmitting/recording device.

29. At approximately 6:20 p.m., DEA investigators dropped off CS-1 near a "Jamba Juice" restaurant located at 605 W. Manchester Boulevard in Inglewood, California. A DEA investigator conducting surveillance at the time that CS-1 was dropped off, observed a white BMW X3, bearing California plate number CF66E83, parked near the restaurant.[6]

30. At approximately 6:30 p.m., investigators conducting surveillance observed CS-1 and LIEVANO together, inside the Jamba Juice. An agent who was responsible for monitoring the audio transmission of the meeting heard the parties discussing what he, based upon his training and experience, believed to be prices for cocaine.[7] CS-1 and LIEVANO met for approximately 40 minutes. At the conclusion of the meeting, CS-1 left the Jamba Juice, and was picked up by a DEA Task Force Officer at a parking lot near the restaurant. Thereafter, CS-1 turned over the

---

[4] Portions of the calls were recorded.
[5] All times described herein that occurred in California are reported as Pacific Standard Time.
[6] The BMW X3 was subsequently identified by DEA investigators as LIEVANO's vehicle.
[7] The recording was preserved; however, because the meeting location was crowded and loud, the recording is of poor quality.

recording device.

31.     At a subsequent debriefing, CS-1 stated that when he/she arrived at the Jamba Juice, LIEVANO and a person referred to as "Andy" ("ANDY") were already at the restaurant.[8] CS-1 described ANDY as male, Hispanic, heavy set, and approximately 40 years of age. CS-1 stated that during the conversation it appeared as though ANDY was "higher up the food chain." I know from my interaction with CS-1 that by "higher up the food chain," CS-1 meant that ANDY held a more senior position in the drug trafficking organization responsible for supplying the drugs that were being discussed.

32.     CS-1 stated that during the meeting at Jamba Juice, LIEVANO said that he (LIEVANO) ships kilogram quantities of cocaine to Philadelphia, Maryland, and New Jersey. LIEVANO told CS-1 that he (LIEVANO) transported the drugs via tractor-trailers which arrive to their destination and unload at highway weigh stations. CS-1 stated that during the meeting LIEVANO agreed to sell 15 kilograms of cocaine to CS-1 for $16,500 to $17,000 per kilogram. In exchange, LIEVANO stated that CS-1 would be required to pay $60,000 at the time of delivery. CS-1 stated that during the meeting LIEVANO also offered to sell him/her (CS-1) 20 pounds of methamphetamine at $1,300 per pound. CS-1 stated that all prices were based on delivery in Boston.

33.     CS-1 stated that LIEVANO asked him/her (CS-1) to provide him personal details (names and addresses of family members). CS-1, however, did not provide the information. CS-1 stated that LIEVANO requested that CS-1 purchase a new phone. CS-1 stated that LIEVANO instructed that he/she (CS-1) should not talk to anyone except LIEVANO on the new phone. LIEVANO instructed CS-1 to contact him (LIEVANO) once he/she had the new phone. Following

---

[8] DEA investigators are attempting to identify ANDY.

the meeting, LIEVANO briefly contacted CS-1 using FaceTime via Target Telephone 2, to encourage CS-1 to obtain a new phone.[9]

34.   Thereafter, CS-1 obtained a new phone. LIEVANO, however, never successfully shipped controlled substances to CS-1 during that time period from July 2023 through October 2024.

*November 2024 Shipment of Methamphetamine to Massachusetts*

35.   On October 2, 2024, acting at the direction of agents, CS-1 placed a video call to LIEVANO using WhatsApp via a new telephone number, (310) 261-9926 ("Target Telephone 2"). During the recorded conversation, CS-1 provided LIEVANO with an address (given to CS-1 by agents) to which LIEVANO could ship methamphetamine to CS-1 in Massachusetts. LIEVANO then stated in broken English, "I text him right now, as soon as he's got it, he'll set up the box he wants to send you." I know from my training and experience and from conversation with CS-1 that by "I text him right now, as soon as he's got it, he'll set up the box he wants to send you," LIEVANO was telling CS-1 that he (LIEVANO) would instruct a courier to ship methamphetamine to CS-1.

36.   During the October 2, 2024 conversation, LIEVANO asked, "How many can you move in a month?" I know from my training and experience and from conversation with CS-1 that by "How many can you move in a month," LIEVANO was asking CS-1 how many pounds of methamphetamine CS-1 could purchase per month. In response, CS-1 told LIEVANO that he/she (CS-1) had a customer that was interested in purchasing five to ten pounds of methamphetamine per week. CS-1 told LIEVANO that he/she (CS-1) had a different customer who was interested

---

[9] Due to the brevity of the conversations, and the fact that they were unsolicited, the calls were not recorded.

10

in purchasing between two to three pounds of methamphetamine per week. LIEVANO, then asked, "But you just need two in this moment?" CS-1 answered, "Yes, for these two people. one and one." I know from my training and experience and from conversation with CS-1 that by "one and one" CS-1 was confirming that he/she (CS-1) wanted LIEVANO to ship two pounds of methamphetamine to Massachusetts. LIEVANO responded in broken English, "OK, cool. How 'bout picture? You want to see it? Quality?" Thereafter, LIEVANO texted CS-1 a photograph of what he (LIEVANO) claimed was a quantity of methamphetamine. The photograph was texted from Target Telephone 2 using a WhatsApp tool that causes photographs to disappear once viewed. CS-1 successfully captured the photograph on video before it disappeared. Investigators reviewed the photograph. Based on my experience and training, the item depicted in the photograph was consistent in appearance with methamphetamine.

37. On October 18, 2024 LIEVANO contacted CS-1 using WhatsApp via a new telephone number, (213)849-0202 ("Target Telephone 3"). On October 26, 2023, CS-1 received a package mailed by a courier employed by LIEVANO. The package contained a T-shirt but did not contain any drugs. After opening the package, CS-1 complained to LIEVANO about the contents of the package in a WhatsApp text sent to LIEVANO via Target Telephone 3. LIEVANO responded, "Omg…I take care [of] you, I'm so sorry for this guy."

38. On November 4, 2024, LIEVANO sent a photograph to CS-1 using WhatsApp via Target Telephone 3. The photograph was a screen shot of a receipt bearing the shipping number 1ZK7J8930120014217.[10] LIEVANO then exchanged a series of texts with CS-1 using WhatsApp via Target Telephone 3. LIEVANO texted, "He send in UPS…Tomorrow is there." I know from

---

[10] The receipt also included tracking numbers for a package shipped to Australia (1ZK7J4390420025612) and for a package shipped to New Zealand (1ZK7J5650400002810).

my training and experience that by "He Send in UPS," LIEVANO was telling CS-1 that his (LIEVANO's) courier had shipped the package to CS-1 via United Parcel Service ("UPS") a private common carrier. In response, CS-1 complained that LIEVANO's courier had not used the United States Postal Service ("USPS") Overnight Express delivery, "[W]hat is this guy doing. We were very clear about USPS priority." In response, LIEVANO texted a facepalm emoji followed by "Sorry…This guy is super paisa." I know from my training and experience, that the word "paisa" can be used as a derogatory term for native Mexican citizens.

39. On November 5, 2024, investigators learned that the package bearing tracking number 1ZK7J8930120014217 had arrived at a UPS facility located at 1045 University Avenue, Norwood, Massachusetts. Thereafter, agents traveled to the address previously provided by CS-1 to LIEVANO and retrieved the UPS package.

40. When agents opened the package, they recovered approximately two and a half pounds of clear, rock-like fragments. The rock-like fragments were packaged in plastic bags. Based upon my training and experience, the two and a half pounds of rock-like fragments are consistent with the color, odor, and consistency of crystal methamphetamine, a schedule II narcotic. A DEA laboratory subsequently confirmed that the rock-like fragments received on November 5, 2024 were approximately 97% pure methamphetamine and weighed approximately 1,147 grams ( 2.52 pounds).

*December 2024 Shipment of Methamphetamine and Fentanyl to Massachusetts*

41. On December 2, 2024, CS-1 received a FaceTime call from LIEVANO via Target Telephone 3. The call was recorded. During the call, LIEVANO and CS-1 talked about the purchase of methamphetamine and fentanyl. LIEVANO stated that he (LIEVANO) could send CS-1 "10 or 12 pieces." I know from my training and experience, and from conversation with CS-

12

1, that by "10 or 12 pieces," LIEVANO meant 10 to 12 pounds of methamphetamine. CS-1 responded by telling LIEVANO that he/she (CS-1) only charged his customers $100 per pound of methamphetamine, meaning that he/she (CS-1) only added $100 to the purchase price of each pound of methamphetamine. However, CS-1 stated that he/she (CS-1) "could make a few thousand" per kilogram of fentanyl. LIEVANO then explained, "We have both." I know from my training and experience, and from conversation with CS-1, that by "We have both," LIEVANO was telling CS-1 that he (LIEVANO) was able to supply CS-1 with both methamphetamine and fentanyl. LIEVANO added, "The only thing … I don't want to lie to you, this is not 100 percent, it's like, uh, 85 percent." I know from my training and experience, and from conversation with CS-1, that by "this is not a 100 percent it's like, uh, 85 percent," LIEVANO was telling CS-1 that the fentanyl he (LIEVANO) was selling was not pure. Thereafter, the call concluded.

42.     On December 3, 2024, CS-1 received a FaceTime call from LIEVANO via Target Telephone 3. The call was recorded. During the call, CS-1 provided LIEVANO with a Massachusetts address (given to CS-1 by agents) to which LIEVANO could ship methamphetamine and fentanyl to CS-1. CS-1 then asked LIEVANO, "There's 10?" LIEVANO answered, "There's 10 for now." I know from my training and experience, and from conversation with CS-1, that by "There's 10 for now," LIEVANO was confirming that he (LIEVANO) would ship a package to CS-1 containing 10 pounds of methamphetamine. LIEVANO then stated, "everything right there, at least, … it's seventeen hundred." I know from my training and experience, and from conversation with CS-1, that by "its seventeen hundred," LIEVANO was stating that he (LIEVANO) would charge CS-1 $1,700 per pound of methamphetamine.

43.     On December 8, 2024, CS-1 received a FaceTime call from LIEVANO via Target Telephone 3. The call was recorded. After CS-1 and LIEVANO exchanged greetings, LIEVANO

13

stated,, "I finished yesterday, last night, everything is ready. There's two boxes." LIEVANO continued, "In one I put the piece, plus two, three pounds, and the other one, the rest." I know from my training and experience, and from conversation with CS-1, that by "In one I put the piece, plus two, three pounds, and the other one, the rest," LIEVANO meant that one of the boxes contained one kilogram of fentanyl and two to three pounds of methamphetamine, and the other box contained 7 to 8 pounds of methamphetamine. LIEVANO told CS-1 that the packages would arrive on Wednesday, meaning December 11, 2024. Thereafter, the call concluded.

44. Following the December 8, 2024 Facetime call with LIEVANO, CS-1 informed investigators that based upon conversation with LIEVANO, he/she (CS-1) understood that LIEVANO would charge $1,700 per pound of methamphetamine and $21,500 per kilogram of fentanyl. Based on my experience and training, I know that these prices are consistent with the prevailing price of fentanyl and methamphetamine in southern California.

45. On Wednesday, December 11, 2024, CS-1 received a FaceTime call from LIEVANO via Target Telephone 3. The call was recorded. During the call, LIEVANO provided a tracking number, and showed a receipt for the incoming shipments. The receipt (captured on video) included USPS tracking numbers for two boxes shipped to Massachusetts: tracking number 9405511899561586137364 and tracking number 9405511899561586706591. LIEVANO stated that he (LIEVANO) thought the packages would arrive on Thursday or Friday, meaning either December 12, 2024 or December 13, 2024.

46. On December 16, 2024, investigators learned that two packages bearing tracking number 9405511899561586137364 and tracking number 9405511899561586706591 had arrived at a United States Postal facility in Boston, Massachusetts. Inside the package bearing tracking number 9405511899561586137364 investigators recovered two bundles wrapped in black and

clear and plastic. Inside one of the bundles investigators recovered approximately 3 pounds of clear, rock-like fragments. A DEA laboratory subsequently confirmed that the combined contents of the three rock-like fragments seized from the package bearing tracking number 9405511899561586137364 were approximately 93% methamphetamine and weighed approximately 1,334.6 grams (2.94 pounds).

47. When investigators opened the second bundle recovered from inside the package bearing 9405511899561586137364 they recovered approximately one kilogram of a white, brick-shaped powder. A DEA laboratory subsequently confirmed that the combined contents of the three rock-like fragments seized from the package bearing tracking number 9405511899561586137364 contained fentanyl and weighed approximately 1001.2 grams (1.01 kilogram).

48. Thereafter, agents opened the package bearing tracking number 9405511899956158670659. Inside, they recovered a third bundle wrapped in black and clear plastic that contained approximately 7 pounds of clear, rock-like fragments. A DEA laboratory subsequently confirmed that the combined contents of the three rock-like fragments seized from the package bearing tracking number 9405511899956158670659 were approximately 97% methamphetamine and weighed approximately 3,108 grams (6.85 pounds).

### The Target Offenses and Cellular Telephones Generally

49. Based on my training and experience, I know that drug traffickers need to communicate regularly with their suppliers in order to exchange drugs and money. In my experience, the majority of such drug-related communications are carried out by cellular telephone, either by using wire (voice) or electronic (text) communications. I know that searches of cellular telephones reveal text and other electronic messages, contact numbers, and recently

15

called numbers, all of which are likely to show LIEVANO's involvement in drug trafficking activities.

50.    A forensic search of cellular telephones allows investigators to obtain stored information, including the telephone number assigned to the cellular telephone; call logs; address and telephone books; contact names (for which drug dealers often include lists of customers and related identifying information); and text messages, which for drug dealers often include records concerning the transportation, ordering, sale, distribution of controlled substances, and concerning proceeds of drug sales and drug trafficking.  They also include evidence of user attribution, showing who used or owned the cellular telephone at the time it was seized by showing when things described in this affidavit were created, edited, or deleted, such as call logs, address and telephone books, contact names, records, saved usernames, passwords, and documents.

51.    I know that all of the Seized Devices are iPhones.  I know that iPhones are handheld wireless devices used for voice and text communication as well as for accessing the internet. iPhones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  iPhones usually contain a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone.  In addition to enabling voice communications, iPhones offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet, including electronic mail ("email"), Facebook Messages, and other forms of electronic communications.  iPhones also include global

positioning system ("GPS") technology for determining the location of the device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as identify criminal accomplices.

52.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that electronic files or remnants of such files can be recovered from iPhone and mobile phones months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their telephones, they can easily transfer the data from their old telephone to their new telephone.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user generated files and storage media, internal hard drives contain electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

   d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

Evidence of the Target Offenses and Target Telephone 1

53.     For the reasons described above, and based on my training, experience, and

familiarity with this investigation, I believe that LIEVANO was actively engaged in the distribution of drugs, specifically methamphetamine, fentanyl, and cocaine. As described herein, during the course of the investigation, LIEVANO negotiated drug deals with CS-1via three different cellular telephones.

54. I know from my training and experience, that drug dealers often drop and/or rotate cellular phones in order to obstruct ongoing law enforcement investigations. I know further that, as described herein, LIEVANO was very disciplined with regard to dropping or rotating cellular telephones. In January 2024, LIEVANO explained that he used a different telephone for each customer. In February 2024, after a face to face meeting in Los Angeles, LIEVANO required CS-1 to use a new cellular telephone. As described herein, LIEVANO dropped and/or rotated two previous phones (Target Telephone 1 and Target Telephone 2) used to negotiate drug deals with CS-1.

55. I further know that LIEVANO communicated with other, unidentified members of the conspiracy. For example, LIEVANO told CS-1 that he (LIEVAO) used a truck driver. Likewise, during a call in August 2023, LIEVANO stated, "We need to pay him over there." Based upon my training and experience and conversation with CS-1, I believe that by "him over there," LIEVANO was referring to a drug supplier located in Mexico. Finally, during a face to face meeting in Los Angeles in February of 2024, LIEVANO introduced CS-1 to a person named "ANDY." CS-1 believed that LIEVANO was subordinate to ANDY.

56. As such, based on the information that I have obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe that there is probable cause to believe that LIEVANO used one or more of the Seized Devices (as further described in Attachment A) to facilitate the Target Offenses, to communicate with drug suppliers, with

customers, and with co-conspirators, and that communications, records, appointments and other information and evidence of the commission of the Target Offenses (more specifically, the items set forth in Attachment B) will be found in the Seized Devices.

## Conclusion

57. For the reasons set forth above, and based on my training, experience, and familiarity with this investigation, I submit that there is probable cause to believe that the Seized Devices contain records and other evidence of the Target Offenses. More specifically, I submit that there is probable cause to believe that the Seized Devices (as further described in Attachment A will contain evidence, fruits, and instrumentalities of the Target Offenses (as set forth in Attachment B). Accordingly, I respectfully request that search warrants be issued for the search of the Seized Devices.

Respectfully submitted,

*Christina Pasquarello /by Paul G. Levenson*
Christina Pasquarello
DEA Task Force Officer

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on April __17__, 2025:

Hon. Paul G. Levenson
United States Magistrate Judge